IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MOM365, INC. f/k/a OUR365, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Cause No.:** |
| | ) | |
| v. | ) | **EQUITABLE RELIEF SOUGHT** |
| | ) | |
| CHRISTINE PINTO and MARIE | ) | **JURY DEMANDED** |
| BROWNRIGG, | ) | |
| | ) | |
| | ) | |

**Defendants.**

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Mom365, Inc. f/k/a Our365, Inc. ("Mom365" or the "Company"), by and through the undersigned counsel, and for its Complaint for Injunctive Relief and Damages against Christine Pinto ("Pinto") and Marie Brownrigg ("Brownrigg") (collectively referenced as "Defendants"), states as follows:

### INTRODUCTION

1.    Mom365 is in the newborn photography business that started in 1947. Mom365 contracts with 700 hospitals and hospital groups in 47 states whereby Mom365 agrees to have photographers available to take newborn baby photos at the individual hospitals. Mom365's business is unique in several respects, including, without limitation, its proprietary training developed by Mom365 to train photographers who will be interacting with the new parents and photographing newborn babies. Mom365 protects its business plans, customer contacts and related information through various means including, without limitation, non-solicitation, confidentiality and non-compete agreements with its employees.

2.      This lawsuit relates to two high-level field employees, Christine Pinto ("Pinto")
and Marie Brownrigg ("Brownrigg"), both of whom were "regional directors" in Mom365's
organization and whose employment with the Company ended in July 2018.  Both Pinto and
Brownrigg have non-solicitation, confidentiality and non-competition obligations in force and
effect.  In direct violation of their respective written agreements and the obligations thereunder,
these two former regional directors together with Stephen Hardin have started a new business
that competes directly with Mom365, VIP Baby Portraits ("VIP Baby").

3.      Pinto and Brownrigg are listed and pictured on VIP Baby's website as its Vice
Presidents of Sales.  Steve Hardin is listed and pictured on the VIP Baby's website as its
President.  John Johnson Declaration ¶ 43 & Ex. 5 at Exhibit A.

4.      Based on email sent by Pinto on May 7, 2019 soliciting a substantial customer of
Mom365, VIP Baby is operating as a division of VIP Recognition.  Annamarie Whitesell
Declaration ¶ 4 at Exhibit B.  VIP Recognition LLC, a Texas limited liability company, is listed
on the Texas secretary of state website as being a company whose registered agent is Stephen R.
Hardin.  *See* Exhibit C.

5.      On or before May 1, 2019, Pinto changed her LinkedIn profile to reference her
association with VIP Baby.  John Johnson Declaration ¶ 50 at Exhibit A.

6.      Pinto has solicited at least one hospital under contract with Mom365.  Mom365
learned this on May 8, 2019.  Annamarie Whitesell Declaration ¶ 4 & Ex. 1 at Exhibit B.

7.      Pinto's and Brownrigg's VIP Baby activities violate their respective non-
solicitation, confidentiality and non-competition agreements with Mom365.

8.      Further, upon information and belief, Pinto and Brownrigg are exploiting their
knowledge of Mom365's proprietary training methods and relationships with local

2

photographers to gain an unfair business advantage, again in violation of defendants' post-employment restrictive covenants.  Mom365 seeks injunctive relief enforcing the confidentiality, non-solicitation, and non-competition provisions of the defendants' agreements and recover damages and attorneys' fees and costs.[1]

## PARTIES, JURISDICTION AND VENUE

9.      Mom365, Inc., formerly known as Our365, Inc., is a Missouri business corporation with its principal place of business in Saint Charles, Saint Charles County, Missouri.

10.      Upon information and belief, Pinto is a citizen of Silverlake, Los Angeles County, California.  Pinto's email signature block and LinkedIn page identify her principal office is now located in Houston, Harris County, Texas.  Exhibit A–10; Exhibit B–1.

11.      Upon information and belief, Brownrigg is a citizen and resident of Tampa, Hillsborough County, Florida.

12.      Pinto's and Brownrigg's breaches of their confidentiality, non-solicitation, and non-competition agreements adversely affects business of Mom365 far in excess of $75,000.  Specifically, the contacts with Mom365 hospital customers are worth well in excess of $75,000.  Thus, if defendants' conduct is not enjoined, Mom365 stands to lose far in excess of $75,000.

13.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because a substantial amount of the revenues that are the subject of this action are situated in this district

---

1 Brownrigg and Pinto both have arbitration provisions related to their non-solicitation and confidentiality agreements.  Those agreements call for injunctive relief to be sought in court and the remainder of any dispute to proceed in arbitration.  Brownrigg and Pinto's non-competition agreements call for venue in the Missouri courts.

and because the defendants have submitted to the exclusive jurisdiction of the state and federal courts of Missouri as further alleged throughout this Complaint.

15.     In Brownrigg's February 2, 2017 "Agreement Not to Compete or Disclose Confidential Information", she agrees to exclusive venue in the state and federal courts of Missouri.  John Johnson Declaration ¶ 21 & Ex. 4 at Exhibit A.

16.     In Pinto's September 5, 2012 "Agreement Not to Compete or Disclose Confidential Information", she agrees to venue in the state and federal courts of Missouri.  John Johnson Declaration ¶ 20 & Ex. 3 at Exhibit A.

17.     Further, Both Pinto and Brownrigg executed a "Employee Confidentiality, Non-Solicitation, Release and Arbitration Agreement" in June 2018.  John Johnson Declaration ¶ 16 & Ex. 2 at Exhibit A.

18.     The June 2018 Agreement provides, in part:

> "[T]he Company may institute, any suit, action or other legal proceeding out of or relating to [the restrictive covenants], including, but not limited to, any action commenced by the Company for preliminary or permanent injunctive or other equitable relief, will be instituted in the United States District Court for the Northern [sic] District of Missouri or if such court does not have or will not accept jurisdiction, in any court of general jurisdiction in Missouri.  I consent and submit to the personal and exclusive jurisdiction of such courts in any such suit, action or proceeding. * * *  I waive any objection that I may have to the laying of venue of any such suit, action or proceeding in any such court and any claim or defense of inconvenient forum.

Id.

## FACTS COMMON TO ALL COUNTS

### A.     Mom365's Business Investment

19.     Mom365 counts over 700 hospitals among its current customers, with some relationships dating back to the 1970s.  Mom365 has invested substantially in knowing its

hospital customers, knowing their unique, particular needs and requirements, and delivering

customized products and services for customers.  Each hospital is unique in its processes,

procedures and scheduling requirements.  To acquire a hospital customer takes significant effort.

It can take months, if not years, to secure a contract with a new hospital.  Mom365 spends

hundreds of thousands of dollars annually on business development.  Johnson Dec. ¶ 2 at Exhibit

A.

20.      Even when Mom365 makes a pitch and the hospital agrees to retain it, drafting

and negotiating a contract can take one to two months.  Onboarding a hospital then takes two to

four months and costs Mom365 approximately $10,000 per hospital.  An investor purchased all

of Mom365's stock in June 2018.  Johnson Dec.  Johnson Dec. ¶ 3 at Exhibit A.

21.      Mom365's business is unique in several respects, including its proprietary

training, developed by Mom365, to train photographers who will be interacting with the new

parents and photographing newborn babies.  Johnson Dec.  ¶ 4 at Exhibit A.

22.      Mom365 builds and maintains relationships with its hospital customers through

corporate and field sales and marketing employees, led by regional directors. Mom365 regional

directors are the principal contact for the hospitals in their territory.  They know the customers'

specific needs, make decisions regarding customer customization, talk and meet with hospital

management regularly, and are critical to keeping the hospital customer accounts. Johnson Dec.

¶ 6 at Exhibit A.

23.      At the relevant times in this matter, Mom365 had three (3) regional directors of

which Defendants were two.  Johnson Dec. ¶ 22 at Exhibit A.

24.      Regional directors are responsible, together with the CEO and business

development team, to negotiate contracts.  Each regional director knew, and regularly reviewed,

5

the terms of hospital contracts, commission rates, renewal dates, and custom services and products for the hospital customers. They also knew the operation of each hospital, the shifts and procedures photographers had to follow, and in general, the specific needs of each hospital. Each hospital required customization to meet its unique needs. Regional directors customized delivery of services at the hospitals in his or her territory. Customization could be anything from where photographers were required to park to "quiet hours" when photographers were restricted from maternity wards. Customization can include unique co-branding projects between Mom365 and a hospital. Johnson Dec. ¶ 8 at Exhibit A.

**B.     Mom365's Confidential Information**

25.     Mom365 has security procedures to restrict access to critical business strategy, customer information, and contract terms. Access to customer contracts is limited to the CEO, the contract manager, regional directors, and certain employees in Mom365's finance and information-technology departments. That access is controlled through computer systems, including SAP. Johnson Dec. ¶ 9 at Exhibit A.

26.     Regional Directors are required to maintain customer requirements and customization information securely, sharing only with leadership and individual District Managers who need access to the information to implement custom programs at the particular hospital. Johnson Dec. ¶ 10 at Exhibit A.

27.     As regional directors, Defendants participate in strategy concerning renewing contracts, including determining or recommending commission/payment rates. This strategy is limited to the CEO, business development team, and regional directors. Business development documents and records are restricted on Mom365's computer systems to protect the data. Johnson Dec. ¶ 11 at Exhibit A.

28.     As regional directors, Defendants have access to the Company's customer database which the Company has developed over Mom365's 70 years.  Mom365 spends significant sums maintaining its contract data and related customer information.  Every day, regional directors receive and use confidential information to provide the best service to Mom365's hospital customers.  Johnson Dec. ¶ 12 at Exhibit A.

C.     **New Ownership and CEO of Mom365 on June 21, 2018**

29.     An investor purchased all of Mom365's stock in June 2018.  That transaction closed on June 21, 2018.  Johnson Dec. ¶ 13 at Exhibit A.

30.     That transaction closed on June 21, 2018.  In connection with that transaction, a new CEO for Mom365, John Johnson, was retained and started his employment on June 21, 2018.  John Johnson Declaration ¶ 13 at Exhibit A.

31.     On the day the transaction closed, Johnson immediately traveled to the offices of Mom365 in Missouri to meet with employees and begin his assessment of the business.  Johnson met with corporate employees in-person at Mom365's offices in Missouri, and met with field employees, including Brownrigg and Pinto, by telephone.

32.     As one of the first of Johnson's acts, in consideration of continued employment, all Mom365 employees were required to reaffirm their existing non-solicitation and confidentiality obligations.  A true and correct copy of the June 2018 agreement that each employee sign is attached to the John Johnson Declaration.  Exhibit A–2.  The 2018 agreement did not modify or otherwise affect Brownrigg's and Pinto's existing non-competition obligations.

33.     Brownrigg executed the June 2018 Agreement.  John Johnson Declaration ¶ 18 at Exhibit A.

34.     Pinto executed the June 2018 Agreement. John Johnson Declaration ¶ 18 at Exhibit A.

35.     In fact, all Mom365 employees executed the June 2018 Agreement. Had any Mom365 employees failed to execute the June 2018 Agreement, CEO Johnson would have promptly terminated their employment.  John Johnson Declaration ¶ 18 at Exhibit A.

36.     In addition to the obligations under the June 2018 Agreement, Brownrigg and Pinto had prior non-competition agreements that continued in force and effect. True and correct copies of Brownrigg's pre-2018 agreements with Mom365, Inc. are attached to Johnson's Declaration at Exhibit A–3.

37.     At the time of acquisition, Mom365 had several levels of field employees, the most senior of which was "regional director."  In June 2018, Mom365 had three regional directors, namely, Marie Brownrigg, Christine Pinto and Keith Reed.

38.     When CEO Johnson started on June 21, 2019, he requested reporting from employees, including Brownrigg and Pinto.  John Johnson Declaration ¶ 36 at Exhibit A.

39.     For instance, Johnson requested reports describing how often regional directors were in the field working with their district managers.  Johnson required compliance with schedules and weekend visits, practices and procedures.  Johnson discovered that neither regional directors nor their district managers were ever in the Hospitals on the weekends.  This was contrary to company policy and was a significant missed opportunity that had to be addressed.  John Johnson Declaration ¶ 37 at Exhibit A.

40.     Johnson assessed skill sets of Mom365 employees, including Brownrigg and Pinto.

41.     Additionally, because Johnson expected to continue the employment of the three regional directors, he shared his business strategy to improve and grow Mom365. Johnson shared this business strategy in regular calls with Pinto and Brownrigg that occurred approximately every other day for about 30 minutes a call. John Johnson Declaration ¶ 40 at Exhibit A. Johnson also communicated with them regularly by email. Id.

42.     Ultimately, on or about July 8, 2018, Johnson determined that the employment of Pinto and Brownrigg should be terminated. Thereafter, on July 11, 2018, Johnson terminated Brownrigg and Reed. Johnson terminated Pinto the following day, on July 12, 2018.

43.     At the time of termination, Ms. Brownrigg's annual salary was $105,000. At termination, she was paid for 80 hours of vacation for a total of $4,038.46. At the time of termination, Ms. Pinto's annual salary was $97,500. Ms. Pinto was paid at termination for 7.1 hours of personal time at $332.81 and unused vacation pay of $7,875.00.

44.     In late April 2019, Johnson became aware that Pinto may have become associated with a new newborn photography business even though her non-solicitation and non-competition obligations do not expire until 2019 and 2020 respectively.

45.     In the course of his investigation of the claims, Johnson found a website called "VIP Baby Portraits" on line. The website was not finished or active when he first viewed it. It has since gone live. A true and correct copy of the web pages are printed and attached as Exhibit A–4.

46.     On information and belief, Defendants' plans to form VIP Baby dated back to at least December 2018, when the VIP Baby web address was first registered by Hardin. *See* Registrar information attached as Exhibit D.

47.     The VIP Baby website lists Ms. Pinto and Ms. Brownrigg as having VP of Sales roles.

48.     The business of VIP Baby appears very similar to Mom365.  VIP Baby contracts with hospitals to have VIP Baby's photographers at the hospitals to photograph newborn babies. John Johnson Declaration ¶ 45 at Exhibit A.

49.     On April 23, 2019, Johnson directed the company's attorneys to send cease and desist letters to certain former Mom365 employees.  True and correct copies of the cease and desist letters to Pinto and Brownrigg are attached to Johnson's Declaration at Exhibits A–5 and A–6.

50.     The third regional director, Mr. Reed, responded immediately to the company attorney's letter and advised that while he had been offered a job by VIP Baby, that he had not accepted and that he had started a business that was not in competition with the Company in accordance with his obligations under his non-compete and non-solicitation agreements.

51.     Brownrigg responded through counsel that she would contest the enforceability of the June 2018 agreement.  Her lawyer did not make any statements regarding VIP Baby, and neither confirmed nor denied that his client is involved in a leadership role at VIP Baby Portraits. A true and correct copy of the letter is attached as Exhibit A–7.

52.     Pinto has failed to respond in any way, despite a reminder letter on April 30, 2019.  A true and correct copy of the April 30, 2019 letter to Pinto is attached to Johnson's Declaration as Exhibit A–8.

53.     On May 1, 2019, Ms. Pinto updated her LinkedIn profile to identify her as the Vice President of VIP Baby Portraits.  John Johnson Declaration ¶ 50 at Exhibit A.

54.     On May 8, 2019, Mom365 learned that Pinto sent an email to a significant customer of Mom365 soliciting its business for VIP Baby Portraits.   John Johnson Declaration ¶ 51 at Exhibit A; Exhibit B–1.

55.     Pinto's May 7, 2019 solicitation of the Company's customer admits the unique, proprietary information she gained from her ten years working at Mom365 in her various positions including Regional Director:

> I have spent the last ten years familiarizing myself with the business, from Photographer, Certified Field Trainer, District Manager, Assistant Director and most recently as Regional Director of the largest newborn photography company in the nation.
>
> Having done so gives me a unique perspective, and ultimately the ability to formulate a program that encompasses all the most important characteristics in creating a highly effective and successful new division.

Whitesell Declaration at Exhibit B.

56.     This email was sent to at least one significant Mom365 hospital customer, a hospital that has approximately 10,000 births a year.  Whitesell Declaration ¶ 3 at Exhibit B.

57.     On information and belief, this email was also sent to other Mom365 customers with whom Pinto and Brownrigg had relationships in the role as regional director.

58.     Both Pinto and Brownrigg have confidential, proprietary information of Mom365 regarding the approximately 200 plus customers in each of the respective regions they were in charge of for Mom365, including who are the contacts within hospital leadership, including senior marketing executives, nursing executives, those in-charge of access and scheduling and other hospital leadership.  They also know the terms of each contracts Mom365 has with hospitals and hospital groups in their respective territories, including when those contracts are up for renewal and their cancellation provisions.  They also had access to the financial details of the

contracts including commission structure, any co-marketing programs, the sales volume for hospitals and hospital systems in their territories.

59.     In addition, both Pinto and Brownrigg worked on accounts that were national in scope, and for those accounts, they would have had access to the relevant contracts and sales data.

60.     Pinto and Brownrigg had access to data concerning the number of births per hospital, the data concerning photography product sales for hospitals they covered, which hospital wanted and had co-marketing programs.

61.     In particular, at the time of acquisition, Mom365 had three regional directors, namely, Marie Brownrigg, Christine Pinto and Keith Reed.  Brownrigg, Pinto and Reed were each responsible for approximately 1/3 of Mom365's hospital customers.  This meant that Brownrigg and Pinto were responsible for approximately 200-250 hospital customers each. They were integral to each customer hospital in their territory.  Each had profit and loss responsibility, responsibility for directly supervising numerous district managers and indirectly supervising hundreds of photographers.

62.     For each of their hospitals, Brownrigg and Pinto were in a position to make customizations for the hospitals in their territory, everything from the number of photographers they hired and staffed, and the number of shifts.

63.     Brownrigg and Pinto were charged with submitting significant process changes, special projects, and unique requests through corporate.  Brownrigg and Pinto knew what accommodations and special requests Mom365 agreed to and what accommodations Mom365 declined.  As a result, Brownrigg and Pinto have unique knowledge about what customer needs might cause a particular hospital to make a change in its newborn photography provider.

64.     Brownrigg and Pinto regularly communicated with key contacts at the hospital. They also traveled to the hospitals to meet with key hospital executives.

65.     Brownrigg and Pinto identified "at risk" hospitals.  They were privy to the full list of "at risk" hospitals throughout the United States and to Mom365's strategy to ensure continued relationships.

66.     Brownrigg and Pinto worked closely with Mom365 business development leaders to win business from new hospitals and then transition those hospitals into Mom365's system.

67.     Over the ten (10) years that Pinto worked at Mom365, she developed hundreds of contacts with hospitals and hospital executives that were key to knowing customers' specific needs.  These contacts are critical to keeping accounts.

68.     The confidential sales and customer information Pinto acquired while working at Mom365 gives her a competitive advantage as a salesperson in the newborn photography industry.

69.     Likewise, over the nearly two (2) years that Brownrigg worked at Mom365, she developed dozens, if not hundreds, of contacts with hospitals and hospital executives that were key to knowing customers' specific needs.  These contacts were critical to keeping accounts.

70.     The confidential sales and customer information Brownrigg acquired while working at Mom365 gives her a competitive advantage as a salesperson in the newborn photography industry.

71.     Mom365 also invested significantly in sending Brownrigg and Pinto to conventions and conferences, both trade association conventions and hospital and hospital-system conferences and meetings.  A national convention booth could easily cost Mom365

$15,000 plus individual travel costs. Travel costs for Brownrigg or Pinto at a national convention could be $1,000-$2,000 each depending on location and length of the convention.

72.      For instance, Pinto, who had been with the company since April 2008, participated in multiple national and local Association of Women's Health, Obstetric and Neonatal Nurses ("AWHONN") conventions and meetings.

73.      Brownrigg, who joined Mom365 in February 2017, attended both a Florida convention for a trade association known as AWHONN and a national convention for the same association.

74.      In early May 2019, the website for the AWHONN annual conference (https://www.awhonn.org/ and https://awhonnconvention.org/) listed VIP Baby Portraits as an exhibitor in booth 1108.  The company is described as follows:

> VIP Baby offers the highest quality artistic photography with a sensitive approach for moms and hospitals.  With over fifty years of experience in the portrait photography market, our innovative approach is designed for minimal disruption.

**D.      The Agreements Protecting Confidential and Proprietary Information**

75.      Defendant Pinto re-affirmed her confidentiality, non-solicitation, and non-competition obligations again on or about on or about September 5, 2012, by executing a "Agreement Not to Compete or Disclose Confidential Information."

76.     Among the provisions, Pinto agreed not to compete for two (2) years after the date of termination of her employment.  The provision states:

> 4.     AGREEMENT NOT TO COMPETE.  As a material term of this Agreement and in order to protect the goodwill, the customer and vendor relations, the Confidential Information, the competitive business advantage of Our365 and Our365's investment in Employee's training and education, employee agrees that for a period of two (2) years (or if this period is unenforceable, for such period as shall be enforceable) after the date of the termination of Employee's employment with Our365, Employee will not, directly or indirectly, either individually or on behalf of or with any person or entity, contact, solicit, render, perform, or provide any in-hospital infant photography , or accept any in-hospital infant photography or any other business from any actual or prospective customers of Our365.

77.     On February 17, 2017, Brownrigg executed an "Agreement not to Compete or Disclose Confidential Information" containing a two year non-compete substantially similar to Pinto's.  John Johnson Declaration ¶ 21 & Ex. 4 at Exhibit A.

78.     After an investor purchased all Mom365's stock on June 21, 2018, all employees were required to electronically sign an "Employee Confidentiality, Non-solicitation, Release and Arbitration Agreement" attached as Exhibit A (the "2018 Agreement").

79.     The 2018 Agreement contains confidentiality provisions, including the following:

> During and after my employment, I will (i) neither disclose nor use for my direct or indirect benefit, or the direct or indirect benefit of any third party, and (ii) use my best efforts to maintain, the confidentiality of all Confidential Information that I have access to during my employment. The term "Confidential Information" means any information that the Company treats as confidential. Examples of Confidential Information include: any information relating to research, processes, inventions, products, methods, formulae, algorithms, computer codes or instructions, software, documentation, equipment, costs, customer lists, business studies, business procedures, finances, personnel, and other materials that have not been made available to the general public. Failure to mark any Confidential Information as confidential or proprietary will not affect its status as Confidential Information under the terms of this Agreement.

John Johnson Declaration ¶ 16 & Ex. 2 at Exhibit A.

80.     The 2018 Agreement contains a one year non-solicitation of customers agreement which states, in part:

> Without the prior express written consent of the Company in its sole discretion, for the one (1) year period immediately following the termination of my employment with the Company, I will not, directly or indirectly: (i) sell, promote, solicit, call on, or provide any Competitive Offering to (i) any person or entity that was a customer, client or licensee of the Company; (ii) any person or entity that is a customer, client or licensee of the Company at the time of the cessation of my employment with the Company; or (iii) any person or entity that was a prospective customer that the Company was actively attempting to solicit. . . . The restrictions in this Paragraph  . . . will only apply to persons or entities with whom I had "Material Contact" on behalf of the Company.

Id.

81.     The 2018 Agreement contains a one (1) year non-solicitation of other Mom365

employees which states, in part:

> Without the prior express written consent of the Company in its sole discretion, for the one (1) year period immediately following the termination of my employment with the Company, I will not, directly or indirectly: (i) employ, engage or retain, or arrange to have any other person or entity employ, engage or retain any person who has been employed, engaged or retained by the Company as an employee, contractor, consultant or agent at any time during the one (1) year period preceding the date upon which my employment with the Company is terminated; or (ii) influence or attempt to influence any such person to terminate or modify detrimentally his or her employment arrangement or engagement with the Company.

Id.

82.     Pinto and Brownrigg executed the 2018 Agreement in June 2018.

83.     As consideration for the 2018 Agreement, company employees received

continued employment, continued customer contacts, and access to Mom365's business strategy.

If any employee had refused to sign the 2018 Agreement, that employee would have been

terminated.

**E.     Pinto and Brownrigg's Solicitation of Employees and Customers for a Competing Business.**

84.     Beginning in or about April 2019, defendants Pinto and Brownrigg began listing

themselves as "Newborn Photography Sales" on the website viprec.com and as Regional Vice

Presidents of Sales on the website vipbabyportraits.com.  Upon information and belief,

viprec.com and vipbabyportraits.com are both websites for VIP Baby.

85.     Based on Pinto's May 7 email, it appears that she and VIP Baby intend to staff an

exhibitor booth at the Texas state conference of AWHONN on May 16–18, 2019.  Defendant

Pinto has solicited at least one customer with whom she worked at Mom365 to visit the VIP

Baby exhibitor booth at that conference.

86.     Based on Pinto's email, Pinto and VIP Baby intend to staff an exhibitor booth at

the 2019 AWHONN Convention in Atlanta, Georgia, on June 8–12, 2019.  Defendant Pinto has

solicited at least one customer with whom she worked at Mom365 to visit the VIP Baby

exhibitor booth at that conference.

87.     Notwithstanding Mom365's demands that Pinto and Brownrigg cease and desist

from violating the post-employment restrictive covenants in their agreements, Pinto and

Brownrigg continue to hold themselves out on the VIP Baby website and LinkedIn, email former

customers, and refuse to either acknowledge or comply with their contractual obligations.

### COUNT ONE
### BREACH OF CONTRACT
### (AGAINST DEFENDANT PINTO)

88.     Mom365 incorporates by reference the information contained in Paragraphs 1

through 87 as if fully stated herein.

89.     The Pinto agreements are valid and enforceable agreements that prohibit Pinto

from:

(a)     Competing by directly or indirectly for two (2) years by soliciting, rendering, performing or providing any in-hospital infant photography, or accept any in-house infant photography or any other business from actual or prospective customers of Mom365.

(b)     Disclosing, directly or indirectly, Mom365's confidential business plans, processes, product and customer research, methods, training

17

documentation and information, customer lists and customer contacts, business plans and procedures, and other non-public competitive information;

(c)     Soliciting, directly or indirectly, any customer with whom defendant Pinto has dealt with on behalf of Mom365 in the eighteen (18) months prior to termination on behalf of any business engaged in the marketing or sale of in-hospital baby photography for a period of one (1) year following termination of defendants' employment;

(d)     Directly or indirectly soliciting the employment of any person who has been employed, engaged or retained by Mom365 in the one (1) year period prior to termination for a period of one (1) year following termination of defendants' employment; and

(e)     Arranging, directly or indirectly, for any other person or entity to employ any person who has been employed, engaged or retained by Mom365 in the one (1) year period prior to termination for a period of one (1) year following termination of defendants' employment.

90.     Upon information and belief, defendant Pinto has breached the agreements by,

inter alia:

(a)     Accepting and performing the function of Vice President of Sales for VIP Baby, thereby placing herself in a position where she will inevitably compete with Mom365;

(b)     Accepting and performing the function of Vice President of Sales for VIP Baby, thereby placing herself in a position where she will use, directly or indirectly, the Confidential Information of Mom365 in the performance of her duties;

(c)     Soliciting persons who had been employed by Mom365 to provide the same or similar services to Mom365's hospital partners as employees and/or agents of the competing business VIP Baby; and

(d)     Calling upon the leadership of Mom365's hospital partners to sell the same or similar goods, products, and services that Mom365 offers to those partners on behalf of VIP Baby, including without limitation the e-mail solicitation dated May 7, 2019 (Exhibit B–1).

91.     Pinto's breaches of contract have caused and will continue to cause damage to

Mom365.  Monetary damages are inadequate to prevent all of the harms that will result from

Pinto's continued breaches of her agreements and, accordingly, Pinto must be preliminarily and permanently enjoined from continuing to breach her agreements.

WHEREFORE, Plaintiff Mom365, Inc. respectfully prays that this Court enter an Order that enjoins and restrains the actions set forth in paragraphs below and grants other relief:

(a)   Pinto shall not be involved, directly or indirectly, in any manner, as an officer, director, stockholder, partner, employee, consultant, advisor, independent contractor, or in any other capacity with VIP Baby Portraits, VIP Recognition or any other company;

(b)   Pinto shall cease use of any confidential information or trade secrets of Mom365 shall immediately cease and desist from using or disclosing such information without the express written consent of Mom365;

(c)   Pinto shall not participate in any way in marketing VIP Baby or soliciting Mom365 customers;

(d)   Pinto shall cease and desist from all efforts to solicit any person who had been employed by Mom365 prior to July 12, 2019;

(e)   Pinto shall cease and desist from contacting employees, officers, or directors of the hospital partners with whom defendants worked in the eighteen (18) months predating defendants' termination of employment with Mom365;

(f)   Pinto shall not be involved, directly or indirectly, in the solicitation of or sales to any hospital partner or potential hospital partner of in-hospital newborn photography and associated goods, products, and services;

(g)   Pinto shall not be directly or indirectly involved with, or otherwise attend, meetings of the Association of Women's Health, Obstetric and Neonatal Nurses or other similar conventions, wherever located;

(h)   Pinto shall not list herself as a contact person on the websites viprec.com, vipbabyportraits.com, or any associated or affiliated website offering in-hospital newborn photography; and

(i)   Other relief as this court deems just and appropriate.

<h3 style="text-align:center">COUNT TWO<br>BREACH OF CONTRACT<br>(AGAINST DEFENDANT BROWNRIGG)</h3>

92.   Mom365 incorporates by reference the information contained in Paragraphs 1 through 87 as if fully stated herein.

93.     The Brownrigg agreements are valid and enforceable agreements that prohibit

Brownrigg from:

(a)     Competing by directly or indirectly for two (2) years by soliciting, rendering, performing or providing any in-hospital infant photography, or accept any in-house infant photography or any other business from actual or prospective customers of Mom365.

(b)     Disclosing, directly or indirectly, Mom365's confidential business plans, processes, product and customer research, methods, training documentation and information, customer lists and customer contacts, business plans and procedures, and other non-public competitive information;

(c)     Soliciting, directly or indirectly, any customer with whom defendant Brownrigg has dealt with on behalf of Mom365 in the eighteen (18) months prior to termination on behalf of any business engaged in the marketing or sale of in-hospital baby photography for a period of one (1) year following termination of defendants' employment;

(d)     Directly or indirectly soliciting the employment of any person who has been employed, engaged or retained by Mom365 in the one (1) year period prior to termination for a period of one (1) year following termination of defendants' employment; and

(e)     Arranging, directly or indirectly, for any other person or entity to employ any person who has been employed, engaged or retained by Mom365 in the one (1) year period prior to termination for a period of one (1) year following termination of defendants' employment.

94.     Upon information and belief, defendant Brownrigg has breached the agreements

by, inter alia:

(a)     Accepting and performing the function of Vice President of Sales for VIP Baby, thereby placing herself in a position where she will inevitably compete with Mom365;

(b)     Accepting and performing the function of Vice President of Sales for VIP Baby, thereby placing herself in a position where she will use, directly or indirectly, the Confidential Information of Mom365 in the performance of her duties;

(c)     Soliciting persons who had been employed by Mom365 to provide the same or similar services to Mom365's hospital partners as employees and/or agents of the competing business VIP Baby; and

(d)   Calling upon the leadership of Mom365's hospital partners to sell the same or similar goods, products, and services that Mom365 offers to those partners on behalf of VIP Baby.

95.   Brownrigg's breaches of contract have caused and will continue to cause damage to Mom365.  Monetary damages are inadequate to prevent all of the harms that will result from Brownrigg's continued breaches of her agreements and, accordingly, Brownrigg must be preliminarily and permanently enjoined from continuing to breach her agreements.

WHEREFORE, Plaintiff Mom365, Inc. respectfully prays that this Court enter an Order that enjoins and restrains the actions set forth in paragraphs below and grants other relief:

(a)   Brownrigg shall not be involved, directly or indirectly, in any manner, as an officer, director, stockholder, partner, employee, consultant, advisor, independent contractor, or in any other capacity with VIP Baby Portraits, VIP Recognition or any other company;

(b)   Brownrigg shall cease use of any confidential information or trade secrets of Mom365 shall immediately cease and desist from using or disclosing such information without the express written consent of Mom365;

(c)   Brownrigg shall not participate in any way in marketing VIP Baby or soliciting Mom365 customers;

(d)   Brownrigg shall cease and desist from all efforts to solicit any person who had been employed by Mom365 prior to July 12, 2019;

(e)   Brownrigg shall cease and desist from contacting employees, officers, or directors of the hospital partners with whom defendants worked in the eighteen (18) months predating defendants' termination of employment with Mom365;

(f)   Brownrigg shall not be involved, directly or indirectly, in the solicitation of or sales to any hospital partner or potential hospital partner of in-hospital newborn photography and associated goods, products, and services;

(g)   Brownrigg shall not be directly or indirectly involved with, or otherwise attend, meetings of the Association of Women's Health, Obstetric and Neonatal Nurses or other similar conventions, wherever located;

(h)   Brownrigg shall not list herself as a contact person on the websites viprec.com, vipbabyportraits.com, or any associated or affiliated website offering in-hospital newborn photography; and

(i)   Other relief as this court deems just and appropriate.

## JURY DEMAND

Mom365, Inc. demands trial by jury on all issues so triable.

Dated:  May 13, 2019

Respectfully Submitted,

_/s/Timm W. Schowalter_
Timm W. Schowalter
Sandberg Phoenix & Von Gontard P.C.
600 Washington Ave., 15th Floor
St. Louis, MO 63101
tschowalter@sandbergphoenix.com
Tel: 314-231-3332

Paula K. Jacobi (*pro hac pending*)
Denise A. Lazar (*pro hac pending*)
Gregory S. Gistenson (*pro hac pending*)
BARNES & THORNBURG LLP
One N. Wacker Dr. Ste. 4400
Chicago, IL 60606-2833
(312) 214-4866
(312) 759-5646/Fax
pjacobi@btlaw.com
dlazar@btlaw.com
gregory.gistenson@btlaw.com

Attorneys for Plaintiff Mom365, Inc.

DMS 14495076v1

## VERIFICATION

Pursuant to 28 U.S.C. § 1746(2), I verify under penalty of perjury that the information contained in Mom365, Inc.'s Verified Complaint for Injunctive Relief and Damages is true and correct to the best of his knowledge and information.

JOHN JOHNSON

Executed on: _____May 13th_____, 20 19